UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN KING MEYER,

            Plaintiff,

v.

JOSEPH NATOLE, *et al.*,

            Defendants.

_____/

Case No. 1:14-cv-536

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. *Pro se* plaintiff filed a 65-count complaint directed at six defendants. Although plaintiff is in the custody of the MDOC, his claims arise from incidents which occurred while being held in the Allegan County Jail. This matter is now before the Court on a motion for summary judgment filed by defendants Joseph Natole, M.D. and Janet Lance, L.P.N. (docket no. 199).

### I.      Plaintiff's complaint

### A.      Background

This motion for summary judgment addresses the allegations made against Dr. Natole and LPN Lance in plaintiff's original complaint. By way of background, plaintiff has attempted to amend his complaint. However, as discussed in the Court's Order Regarding Plaintiff's Proposed First Amended Complaint (docket no. 297), the proposed amended complaint was improper. Plaintiff has attempted to file another amended complaint (docket no. 301). That proposed amended

complaint, which is supposed to be limited to claims against another defendant, Dr. Flentje, has not yet been addressed by the Court.

Plaintiff's claims arise from incidents which occurred in 2012. On January 10, 2012, plaintiff was arrested and placed in the Allegan County Jail, charged with the felony of first degree criminal sexual conduct. Compl. at ¶ 15 (docket no. 1, PageID.9); Booking Card (docket no. 1-1, PageID.61). While being held at the jail, plaintiff suffered a cardiac arrest on July 6, 2012. Compl. at ¶¶ 105-106, PageID.15. Plaintiff's complaint alleged that six defendants violated his constitutional rights by acting with deliberate indifference to his serious medical needs: Dr. Flentje; Dr. Natole; social worker Nelson; LPN Lance[1]; Allegan County Jail administrator Marcules; and Allegan County Deputy LaBrie. Defendants Nelson, Marcules and LaBrie have been dismissed from this action.

In the present motion, defendants Dr. Natole and LPN Lance seek summary judgment on plaintiff's claims that they were deliberately indifferent to his serious medical needs, negligent, and committed malpractice because (1) they caused his July 6, 2012 cardiac arrest by prescribing Trazodone, (2) they failed or refused to treat his "classic heart attack symptoms" prior to that date, and (3) they caused him additional injury after July 6, 2012 by prescribing Celexa.

**B.      Plaintiff's allegations against Dr. Natole**

**1.      Deliberate indifference**

Plaintiff alleged six counts against Dr. Natole for deliberate indifference to a serious medical need in violation of the Eighth Amendment: Count 1 (approving the use of Trazodone on March 28, 2012); Count 2 (approving an increase of Trazodone from 50mg to 100mg on April 27,

---

[1] Plaintiff erroneously alleged that Nurse Lance is a registered nurse (RN). Nurse Lance is in fact a licensed practical nurse (LPN). *See* Janet Lance Aff. Certification (docket no. 200-1, PageID.2748).

2012); Count 3 (failing to treat plaintiff's "classic heart attack symptoms" on June 29, 2012); Count 4 (failing to treat plaintiff's "classic heart attack symptoms" on July 4, 2012); Count 5 (failing to treat plaintiff's "classic heart attack symptoms" on July 6, 2012); Count 6 (approving the use of the drug Celexa on July 27, 2012).  Compl. at PageID.21-28.

### 2.    Negligence and medical malpractice

Plaintiff alleged 12 counts against Dr. Natole under state law for negligence and medical malpractice based on the same events: Count 7 (negligent for approving the use of Trazodone on March 28, 2012); Count 8 (malpractice for same reason); Count 9 (negligent for increasing the daily dose of Trazodone from 50mg to 100 mg  on April 27, 2012); Count 10 (malpractice for same reason); Count 11 (negligent for refusing to see plaintiff on June 29, 2012); Count 12 (malpractice for same reason); Count 13 (negligent for refusing to see plaintiff on July 4, 2012); Count 14 (malpractice for same reason); Count 15 (negligent for refusing to see plaintiff on July 6, 2012); Count 16 (malpractice for same reason); Count 17 (negligent for approving use of Celexa on July 27, 2012); and, Count 18 (malpractice for same reason).  Compl. at PageID.29-32). Plaintiff seeks compensatory and punitive damages against Dr. Natole in the amount of $15,000,000.00.  *Id.* at PageId.59.

### C.    Plaintiff's allegations against LPN Lance

### 1.    Deliberate indifference

Plaintiff alleged eight counts against LPN Lance for deliberate indifference to a serious medical need in violation of the Eighth Amendment: Count 37 (approving the use of Trazodone on March 28, 2012); Count 38 (approving an increase of Trazodone on April 27, 2012); Count 39 (failing to treat plaintiff's "classic heart attack symptoms" on June 29, 2012); Count 40

(failing to treat plaintiff's "classic heart attack symptoms" on July 1, 2012); Count 41 (failing to treat plaintiff's "classic heart attack symptoms" on July 3, 2012); Count 42 (failing to treat plaintiff's "classic heart attack symptoms" on July 5, 2012); Count 43 (failing to treat plaintiff's "classic heart attack symptoms" on July 6, 2012); Count 44 (approving the use of the drug Celexa on July 27, 2012).  Compl. at PageID.43-50.

### 2.    Negligence and medical malpractice

Plaintiff alleged 16 counts against LPN Lance under state law for negligence and medical malpractice based on the same events: Count 45 (negligent for approving the use of Trazodone on March 28, 2012); Count 46 (medical malpractice for same reason); Count 47 (negligent for increasing Trazodone on April 27, 2012); Count 48 (medical malpractice for same reason); Count 49 (negligent for failing to treat plaintiff's "classic heart attack symptoms" on June 29, 2012); Count 50 (malpractice for same reason); Count 51 (negligent for failing to treat plaintiff's "classic heart attack symptoms" on July 1, 2012); Count 52 (malpractice for same reason); Count 53 (negligent for failing to treat plaintiff's "classic heart attack symptoms" on July 3, 2012); Count 54 (malpractice for same reason); Count 55 (negligent for failing to treat plaintiff's "classic heart attack symptoms" on July 5, 2012); Count 56 (malpractice for same reason); Count 57 (negligent for failing to treat plaintiff's "classic heart attack symptoms" on July 6, 2012); Count 58 (malpractice for same reason); Count 59 (negligent for ordering the use of the drug Celexa on July 27, 2012).; and Count 60 (malpractice for same). Compl. at PageID.51-54.  Plaintiff seeks compensatory and punitive damages against LPN Lance in the amount of $ 15,000,000.00.  *Id.* at PageId.59.

## II.     Defendants' motion for summary judgment

### A.     Legal standard

Defendants Dr. Natole and LPN Lance have moved for summary judgment pursuant to Fed. R. Civ. P. 56.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the Court is

5

not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.    Plaintiff's claims for deliberate indifference

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.  *Burnett v. Grattan*, 468 U.S. 42, 45 n. 3 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

During the relevant time period, plaintiff was in the custody of Allegan County as both a pre-trial detainee and a convicted felon.[2]  It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).  "Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  Thus, "[w]hether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983."  *Id.*

---

[2] Plaintiff alleged that he was "arrested, booked and lodged in Allegan County Jail" on January 12, 2012.  Compl. at ¶ 15, PageID.9.  He was convicted and sentenced sometime prior to September 13, 2012, the date on which plaintiff was transferred to the MDOC.  *Id.* at ¶ 192, PageID.20.

*See Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) ("[a]lthough the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well") (internal citation omitted).

A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

7

1.      **Dr. Natole**

a.      **Count 1 (approving the use of Trazodone on March 28, 2012) and Count 2 (approving an increase of Trazodone from 50mg to 100mg on April 27, 2012)**

In Counts 1 and 2, plaintiff alleged: (1) that he suffered from a condition known as Long QT Syndrome (a condition described by defendants' expert as "a heart rhythm disorder that can cause fast and chaotic heartbeats" (docket no. 200-1, PageID.2782)); (2) that defendants improperly prescribed him Trazodone (brand name Desyrel) commencing on March 28, 2012; and, (3) that this prescription caused his cardiac arrest on July 6, 2012. Defendants cite a portion of the *Physicians' Desk Reference* from 2012 (attached to plaintiff's complaint) which did not identify any preexisting conditions or contraindications that would make the prescription of Trazodone improper. Plaintiff's Exh. K (docket no. 1-1, PageID.94-97); Defendants' Exh. P (docket no. 200-1, PageID.2693). That being said, the Court notes that this same document includes the following reference to "QT Prolongation" under "warnings and precautions":

> QT Prolongation: Increases the QT interval. Avoid use with drugs that also increase the QT interval and in patients with risk factors for prolonged QT interval.

*Id.* at PageID.95, 2693.

Defendants also refer to a report from their internal medicine expert, Dr. John Bonema, stating that there are no contraindications for the use of Trazodone. Dr. Bonema Expert Report (docket no. 200-1, PageID.2784-2785).

Dr. Natole was aware that plaintiff had been prescribed Trazodone as reflected in plaintiff's progress notes from on July 6th, made by jail staff immediately after plaintiff's cardiac arrest:

8

> Dr. Natole called and notified of events.  Dr. Natole requests AGH ER be
> notified of inmate's medication history, trazadone prescription, and R/O of possible
> ventricular dysrhythmia 2° Trazadone toxicity.  AGH ER staff, [unintelligible],
> notified at 2124.

Progress Notes (docket no. 200-1, PageID.2745).  However, the progress notes make no mention of

any record that plaintiff had a diagnosis of Long QT Syndrome.  Rather, as reflected in progress

notes from July 7th, hospital personnel were concerned with the possibility of an intentional

overdose or environmental conditions as contributing factors:

> Recieved [sic] a call from Bronson ICU Attending Physician, inquiring if it
> was suspected that inmate had been hoarding or cheeking medications.  Physician
> also inquired about inmates [sic] cell temperature.  Informed physician that there was
> not suspicion of inmate cheeking or hoarding medications, and that cell temperature
> could be looked into.
>
> *       *       *
>
> Informed by Sgt that after investigation, cell temperature was warm but not
> excessively hot.  Above information relayed to attending physician.

*Id.*

While the parties have engaged in substantial (and at times excessive) pre-trial

discovery, the Court has not yet issued a case management order setting forth deadlines for expert

reports. Plaintiff has no expert.  However, he has presented evidence from the Bronson Methodist

Hospital (BMH) personnel which refers to Trazodone (Desyrel) as a possible secondary cause of the

cardiac arrest:

> Cardiac arrest due to ventricular fibrillation - full recovery - suspect secondary to
> prolonged QT interval secondary to Desyrel and hypokalemia due to HCTZ.  EP
> studies today.

BMH Cardiology Unit records (July 6 through July 14, 2012) (docket no. 1-2, PageID.134).  This

conclusion also appears in a consult note by Joel H. Reinohoehl, M.D., on July 9, 2012, which

included in the assessment "S/p cardiac arrest, likely secondary to prolonged QT interval with Desyrel and HCTZ use (modest hypokalemia." Based on this record, there is a genuine issue of material fact as to whether the Trazodone (Desyrel) prescription was a cause of plaintiff's cardiac arrest on July 6, 2012.

The issue before the Court is whether Dr. Natole was deliberately indifferent to plaintiff's serious medical needs by prescribing Trazodone. Based on the record in this case, there is no evidence that Dr. Natole prescribed this medication. It is undisputed that plaintiff's psychiatrist, Dr. Flentje, prescribed the Trazodone. At his deposition, plaintiff testified that he knew that it was Dr. Flentje who prescribed the Trazodone after an appointment on March 23, 2012 to help him sleep. Meyer Dep. (docket no. 200-1, PageID.2640). In his certification in support of the motion for summary judgment, Dr. Natole stated that "[i]n 2012, psychiatric care, as well as psychiatric medications, was [sic] administered at the Allegan County Jail by Defendant Gregory Flentje, M.D." and that "I could not start, cancel, or otherwise alter any medications prescribed by Dr. Flentje, including but not limited to Trazodone." Dr. Natole Certification (docket no. 200-1, PageID.2665). Plaintiff further testified that he had no documentary evidence to prove that Dr. Natole had "final say" over starting or increasing the Trazodone prescription, but that he believed Dr. Natole approved the use of the Trazodone because Natole was the medical doctor for the Allegan County Jail. Meyer Dep. at PageID.2462. There is no basis for plaintiff's belief. Plaintiff was aware that Dr. Natole could not address orders pertaining to psychiatric medications. For example, on June 22, 2012, plaintiff wrote an intramural correspondence (kite) to the "DOC" [Dr. Natole] asking to meet "to review my meds as it relates to my weight gain, even with exc and recreation" and that "There are some other issues I would like to also address." Kite (June 22, 2012) (docket no.

10

200-1, PageID.2732).  In response, plaintiff was advised "you'll be seen next Friday [sic] The Med Dr cannot address orders pertaining to PschMeds - (FYI)."  *Id.*  In this regard, the "Psychiatrist Orders" for medication at the jail were kept on a separate document.  *See* Psychiatrist Orders (docket no. 200-1, PageID.2701).  Dr. Natole's name does not appear on this document.  *Id.*

Based on this record, there is no factual basis to support plaintiff's claim that Dr. Natole prescribed or approved of the Trazodone prescriptions on March 28th or April 27th, 2012. Dr. Natole had no personal involvement in this aspect of plaintiff's treatment, which was under the direction of psychiatrist Dr. Flentje.  "Personal involvement is necessary to establish section 1983 liability."  *Murphy v. Grenier*, 406 Fed.Appx. 972, 974 (6th Cir. 2011).  *See Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999) ("[i]t is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions").  Accordingly, Dr. Natole should be granted summary judgment as to Counts 1 and 2.

### b.     Lack of subjective component

Furthermore, plaintiff has failed to establish the subjective component, i.e., that Dr. Natole knew that plaintiff suffered from Long QT Syndrome and that he was "allergic" to Trazodone, and disregarded this excessive risk to plaintiff's health or safety.  *See Farmer*, 511 U.S. at 837.  As discussed in § II.B.1.a, *supra*, there is no evidence that Dr. Natole prescribed the Trazodone, increased the prescription of the Trazodone, or supervised Dr. Flentje's treatment of plaintiff's mental disorders.  However, the Court will also address Dr. Natole's (and LPN Lance's) additional claim that they lacked the subjective intent necessary to violate plaintiff's Eighth Amendment rights.

Dr. Natole points out that plaintiff never disclosed to the jail staff that he had pre-existing cardiac issues or Long QT Syndrome. Upon booking at the jail on January 12, 2012, plaintiff responded affirmatively to the question "High Blood Pressure/Heart Disease/Chest Pain?" with the comment "HIGH BP". Questionnaire (docket no. 200-1, PageID.2631). When asked if he had "Any allergies to food or medications" plaintiff responded "Comments: SEASONAL." *Id.* at PageID.2630. At the jail's health care screening, plaintiff identified his medical problems as "HTN, Anxiety." Health Care Screening (docket no. 200-1, PageID.2634). When asked to identify allergies, plaintiff listed "seasonal" allergies, but did not indicate allergies to medication, food or "other." *Id.* Plaintiff has also presented a document identified as his mental health assessment from January 20, 2012. *See* Mental Health Assessment (docket no. 1-1, PageID.86). This assessment did not identify any cardiovascular problem. *Id.* When plaintiff met with Dr. Flentje on March 23, 2012, he gave the following medical history:

> Mr. Meyer has a history of hypertension for which he is treated with Clonidine and Norvasc. He has a history of seasonal allergies, *no known drug allergies*, and he is status-post an ORIF on his right ankle with hardware.

Outpatient Evaluation (March 23, 2012) (docket no. 200-1, PageID.2690) (emphasis added). In short, while plaintiff advised jail staff of his hypertension, there is no evidence that plaintiff provided jail staff with any medical history of a heart problem, Long QT Syndrome or allergy to Trazodone.

At his deposition, plaintiff could not point to any document in which he disclosed to the jail medical staff that he suffered from cardiac problems or Long QT Syndrome. While plaintiff admitted that his "cardiac issue" was not listed on the jail's questionnaire, plaintiff would not give a direct answer on whether he disclosed the cardiac issue to the jail's medical staff, stating only "I believe I disclosed it to somebody, and I testified that I don't remember if it was the medical or

12

custody staff." Meyer Dep. (docket no. 200-1, PageID.2656-2657). Plaintiff's self-serving statement is insufficient to create an issue of material fact on whether he disclosed this health problem to the jail staff. *See Peterson v. County of Monroe*, No. 12-CV-11460, 2014 WL 1328205 at *7 (E.D. Mich. March 28, 2014), citing *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469, 483 (7th Cir.2004) (noting that a plaintiff "cannot defeat summary judgment by submitting a self-serving affidavit that contains the bald assertion of the general truth of a particular matter." (citations and quotation marks omitted)). "Conclusory assertions, supported only by a party's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir.2008). *See Brooks v. American Broadcasting Companies, Inc.*, 999 F.2d 167, 172 (6th Cir. 1993) (a district court is not required to accept "unsupported, self-serving testimony as evidence sufficient to create a jury question").

In his response to the motion for summary judgment, plaintiff contends that both Dr. Natole and LPN Lance were aware of his cardiac issues citing "RFA #23, 31, 164 and 165." Plaintiff's Brief (docket no. 202, PageID.2814). However, plaintiff did not attach a copy of these documents to his brief. In addition, plaintiff notes that he is allergic to "SSRI's" (as noted on the Psychiatrist Orders (docket no. 200-1, PageID.2701), and that Trazodone is an SSRI, citing "RFA #44, 200." Once again, plaintiff did not provide copies of the cited materials. In this regard, there is evidence that plaintiff did not know that he had prolonged QT syndrome. Dr. Flentje's post-cardiac arrest treatment notes from August 31, 2012, state that:

> Mr. Meyer has recently been identified as having prolonged QT syndrome which led to his acute cardiac event of some weeks ago. He now has a defibrillator and I have an extensive list of medications to avoid including all SSRI's. Given the circumstances, I will simply put Mr. Meyer no [sic] Klonopin, 1 mg daily and wish him well.

Medication Review (docket no. 200-1, PageID.2769).

The Court has also reviewed plaintiff's "Declaration" in response to the motion for summary judgment. *See* Meyer Declaration (docket no. 205). As an initial matter, this document was not certified as required under 28 U.S.C. § 1746. Rather that declaring that his statements were "true and correct" as required by the statute, plaintiff diluted the statutory language stating: "I declare under the penalty of perjury that the foregoing is true and correct *to the best of my knowledge and ability*." Meyer Decl. at PageID.2854 (emphasis added).[3] Because this declaration fails to meet the statutory requirements of 28 U.S.C. § 1746, it is not sufficient to create a genuine issue of material fact to defeat defendants' motion for summary judgment. *See* Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

Furthermore, plaintiff's declaration, made "to the best of [his] knowledge and ability" includes statements of which he has no personal knowledge or competency to testify. See Fed. Rules Civ. Proc. 56(c)(4). For example, while plaintiff states that "Natole and Lance gave me Trazodone, *a known SSRI*." Meyer Decl. at PageID.2853 (emphasis added), he presents no facts to demonstrate that he is competent to testify on the classification of Trazodone as an SSRI. This statement is an

---

[3] 28 U.S.C. § 1746 provides that in any matter which "is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury." 28 U.S.C. § 1746(2). Such statements must be made in substantially the following form "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)". 28 U.S.C. § 1746(2).

attempt to support plaintiff's apparent claim that Dr. Natole and LPN Lance ignored a known allergy to SSRI's.   See *Id* at PageID.2853-2854 ("Instead of providing me with appropriate emergent medical care, Defendants [Dr. Natole and LPN Lance] just continued to poison me with the Trazodone, which they knew I was allergic to.").   However, as discussed, plaintiff never disclosed such an allergy. The first mention of this allergy in Dr. Flentje's August 31, 2012 medication review was made weeks *after* plaintiff suffered the cardiac arrest.   In addition, plaintiff does not set forth any facts to support his conclusory statements that "Natole and Lance were aware of my cardiac issues, including high blood pressure, Long QT Syndrome and a family history of heart disease." *Id.* It is undisputed that plaintiff disclosed his high blood pressure, which was monitored on a regular - and at times daily - basis.   *See* Problem Oriented Record (docket no. 200-1, PageID.2726-2730). However, there is no document supporting plaintiff's statement that Dr. Natole and LPN Lance were aware of a history of Long QT Syndrome or a history of heart disease or that plaintiff advised either defendants Natole and Lance of these facts.   Plaintiff's conclusory, unsupported, self-serving statements are not sufficient to create a genuine issue of material fact to defeat defendants' motion for summary judgment.   *See Arendale*, 519 F.3d at 605; *Brooks*, 999 F.2d at 172.

In sum, there is no evidence that plaintiff ever disclosed his cardiac issues to either Dr. Natole or a member of the jail's medical staff, and some evidence that plaintiff was not even aware of this condition until after the cardiac arrest.   Based on this record, plaintiff has failed to demonstrate the subjective prong of his deliberate indifference claim, i.e., that prior to July 6, 2012 Dr. Natole knew of and disregarded an excessive risk to plaintiff's health due to prescribing Trazodone to a person with a diagnosis of Long QT Syndrome or allergy to SSRIs.

    c.        **Counts 3, 4 and 5 (plaintiff's treatment prior to the cardiac arrest on June 29, July 4, and July 6, 2012)**

Plaintiff contends that in June and July 2012, he was experiencing chest pains, shortness of breath, numb legs, dizziness and cold sweats, which he referred to as "classic symptoms of a heart attack," and that Dr. Natole failed or refused to provide him treatment on June 29th, July 4th and July 6th. In addressing plaintiff's claims against Dr. Natole, the Court will also review evidence relevant to plaintiff's claim that LPN Lance failed to treat his "classic heart attack symptoms" on June 29th, July 1st, July 3rd, July 5th and July 6th.

Dr. Natole points out that there is no documentation or other evidence that plaintiff suffered from "classic heart attack symptoms" during the eight day period from June 29, 2012 through July 6, 2012. In his response, plaintiff cites language from *Estate of Carter v. City of Detroit*, 408 F.3d 305, 307 (6th Cir. 2005), which states in pertinent part that "[t]aking the facts in a light most favorable to the plaintiff, [co-defendant jail lieutenant] knew that [the decedent] was experiencing chest pains and shortness of breath, some of the classic symptoms of a heart attack, believed at the time that she was three days behind in taking heart medication, and yet failed to have her transported to the hospital and failed to inform his relief of her illness."

As an initial matter, plaintiff's medical condition is distinguishable from the decedent's condition in *Estate of Carter*. Unlike the decedent, plaintiff was not three days behind in taking heart medication - indeed plaintiff was taking *no* heart medication which would have placed the symptoms of chest pains and shortness of breath in the context of a medical emergency.

Here, the record reflects that plaintiff wrote some medical kites listing symptoms before the cardiac arrest, but these do not appear relevant to that event. *See* Plaintiff's Brief at

PageID.2815-2816.  On May 1, 2012, plaintiff wrote a kite stating that the doctor had recently changed his blood pressure meds and that he was getting dizzy, had fuzzy vision, was losing his balance and was short of breath.  Kite at PageID.2711.  The kite response stated that plaintiff was assessed and placed on the doctor call.  *Id.*  Dr. Natole reviewed plaintiff's chart on May 4th and decreased the Clonidine.  Progress Notes (docket no. 200-1, PageID.2713).  Three days later, plaintiff advised medical staff that he no longer had dizziness and light-headedness, and that the medicine change was effective.  *Id.*  Plaintiff wrote kites on June 11th, June 14th and June 19th regarding a rash.  Kites at PageID.2719-2721.  Plaintiff was assessed and a doctor call made.  *Id.*  Plaintiff also refers to records from June 22, 2012, June 27, 2012 and July 1, 2012.  *See* discussion, *infra*.

### June 22, 2012

As discussed, on June 22, plaintiff sent a kite asking that his medications be reviewed.  While he referenced "some other issues," plaintiff did not indicate that he was having a reaction to medication, that he was suffering from cardiac problems, or that he was suffering from "classic heart attack symptoms."  Kite at PageID.2732.

### June 27, 2012

On June 27, 2012, plaintiff requested more hydrocortisone cream for an underarm rash and complained of chest muscle pain.  *See* Progress Notes (docket no. 200-1, PageID.2734).  Plaintiff was examined. His blood pressure and pulse were taken and his rash examined.  *Id.*  Plaintiff stated that he exercises daily but denied doing push ups or pull ups.  *Id.* Plaintiff was told "to hold off on exercise for few days to see if pain improves, to let medical know if pain recu[rs]."  *Id.*

17

**July 1, 2012**

On Sunday, July 1, plaintiff sent a kite listing six complaints:  his blood pressure medications made him fall asleep and get dizzy; his leg muscles were cramping and tightening; the Trazodone made his legs feel numb with a sharp burning sensation; he had a stinging pain in his groin; he had random shortness of breath; he had a large growth on this left testicle that he believed was related to the pain in his groin; and he was supposed to see the doctor on Friday (two days before the kite) but the doctor was busy.  *See* Kite (July 1, 2012) (docket no. 200-1, PageID.2736).  In response, plaintiff was advised: "You have been placed on the doctor clinic list to be seen Friday 07/06/12.  Your concerns have been noted in your chart."  *Id.*  At his deposition, plaintiff admitted that there was nothing included in the kite about his suffering from heart attack-like symptoms, nor was there anything preventing him from reporting that he had such symptoms or stopping him from providing more information to the medical staff about his condition.  Meyer Dep. at PageID.2652.

**July 2, 2012**

On July 2, 2012 plaintiff sent a kite to former defendant Nelson in which he asked for information about residential rehabilitation facilities or programs for criminal sexual conduct offenders and a kite asking for permission to pass legal paperwork to his father.  Plaintiff's Kites (July 2, 2012) (docket no. 200-1, PageID.2738-2739).  Nowhere in these two kites did plaintiff report that he was suffering from the "classic heart attack symptoms" referred to in his complaint or any other medical complaint.  *Id.*

**July 3, 2012**

There is no evidence that plaintiff reported any complaints to the medical staff on July 3rd, on which date his blood pressure was monitored and did not require any special attention. *See* Problem Oriented Record at PageID.2729.

**July 4, 2012**

Early on the morning of July 4, 2012, Dr. Natole reviewed plaintiff's chart. *See* Provider Orders (docket no. 200-1, PageID.2741). Dr. Natole reviewed charts because due to the volume of inmates asking for medical attention, he often determined that he could review a patient's chart and make treatment decisions without having to examine the patient in person. Natole Aff. (docket no. 200-1, PageID.2665). Using his education, medical training and clinical experience, the doctor would determine which inmates needed to be seen in person and which inmates' medical needs could be addressed by other medical staff fulfilling his medical orders. *Id.* According to the doctor, "[d]ue to the volume of inmates who requested medical attention, it would be impossible to see each inmate every time I was at the jail, which was once per week." *Id.* On July 4th, after reviewing plaintiff's medical charts, Dr. Natole discontinued plaintiff's current blood pressure medication, Clonidine, and added a different blood pressure medication, Norvasc. Provider Orders at PageID.2741. Dr. Natole noted that he would follow up with plaintiff on July 12th if his condition persisted. *Id.*

In his Declaration (docket no. 205), plaintiff states that "Natole and Lance failed to examine me for my heart attack symptoms, and it was not until July 4, 2012, that Natole adjusted my medications, but not the Trazodone." Decl. at PageID.2853. As discussed, plaintiff's complaints

19

were addressed by the health care providers at the jail and based on his medical history treated by adjusting his blood pressure medication.

### July 5, 2012

The record does not reflect that plaintiff made any documented complaints on July 5, 2012.

### July 6, 2012

Plaintiff made no documented complaints throughout the day on July 6, 2012. At 8:30 p.m. on July 6th, plaintiff suffered a cardiac arrest event while in his dorm, which was known as the D3 unit. Progress Notes at PageID.2744-2745. The circumstances of this incident which were recorded on the jail video system, and his treatment by jail staff were described in detail in a separate Report and Recommendation (docket no. 237, PageID.3010-3015). There is no record that plaintiff sought treatment from either Dr. Natole or LPN Lance on that date.

Viewing the evidence in the light most favorable to plaintiff, the Court concludes that no jury could reasonably find that Dr. Natole observed or was aware of plaintiff suffering from serious cardiac problems (what plaintiff refers to as "classic heart attack symptoms") in the days leading up to the July 6, 2012 cardiac arrest. Accordingly, Dr. Natole is entitled to summary judgment on Counts 3, 4 and 5.

### d.   Count 6 (plaintiff's treatment with Celexa on July 27, 2012)

Count 6 involves a different medication, Celexa, which was prescribed after plaintiff's cardiac arrest. Dr. Natole addresses Count 6 in a 4-sentence footnote. *See* Defendants' Brief, Footnote 6, PageID.2615-2616. The Court does not consider this issue as adequately briefed.

20

"[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to  . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).  Accordingly, Dr. Natole's motion for summary judgment with respect to Count 6 is deemed waived.

### 2.   LPN Lance

#### a.   Count 37 (approving the use of Trazodone on March 28, 2012) and Count 38 (approving an increase of Trazodone on April 27, 2012)

Plaintiff has alleged that defendant LPN Lance was deliberately indifferent for approving the use of Trazodone on March 28, 2012 and approving an increase of the medication on April 27, 2012.  LPN Lance is entitled to summary judgment on Counts 37 and 38 for the same reasons as Dr. Natole. *See* discussion, *supra*.[4]

#### b.   Counts 39, 40, 41, 42 and 43 (plaintiff's treatment prior to the cardiac arrest on June 29, July 1, July 3, July 5, and July 6, 2012)

Plaintiff has alleged that LPN Lance was deliberately indifferent for failing to treat what plaintiff described as "classic heart attack symptoms" in the days leading up to his July 6, 2012 cardiac arrest.  Based on this record, *supra*, there is no evidence that LPN Lance observed or was aware of plaintiff suffering from serious cardiac problems in the days leading up to the July 6, 2012 cardiac arrest. Accordingly, LPN Lance is entitled to summary judgment on Counts 39, 40, 41, 42 and 43.

---

[4] In reaching this determination, it is unclear to the Court as to how a licensed practical nurse, such as LPN Lance, had authority to approve or increase a prescription issued by a psychiatrist.  However, defendants did not address this issue and neither will the Court.

21

### c.      Count 44 (plaintiff's treatment with Celexa on July 27, 2012)

Count 44 involves a different medication, Celexa, which was prescribed after plaintiff's cardiac arrest.  LPN Lance addresses Count 44 in a 4-sentence footnote.  *See* Defendants' Brief, Footnote 6, PageID.2615-2616. The Court does not consider this issue as adequately briefed. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson*, 125 F.3d at 995-96.  Accordingly, LPN Lance's motion for summary judgment with respect to Count 44 is deemed waived.

### III.      Plaintiff's state law claims for negligence and medical malpractice against defendants

### A.      Negligence

Plaintiff has alleged that both Dr. Natole and LPN Lance were negligent in providing him medical care.  Under Michigan law, a plaintiff cannot "plead around" medical malpractice by alleging negligence.  *See Hamer v. County of Kent*, No. 1:13-CV-504, 2014 WL 1276563 at *10 (W.D. Mich. March 27, 2014) ("[J]udges of this court routinely reject efforts by plaintiffs to "plead around" the Michigan malpractice statute by mischaracterizing their claim as one for gross negligence. *See, e.g., Smit v. Meyer*, No. 1:09-cv-213, 2010 WL 4365517, at * 9 (W.D.Mich. Oct. 27, 2010).  Such claims sound in medical malpractice and are subject to the restrictions on such claims imposed by the Michigan Legislature.").

Under Michigan law, the test for determining whether the nature of a claim is ordinary negligence or medical malpractice involves the following inquiry:  whether the claim is being

brought against someone who is capable of malpractice; and, whether the claim sounds in medical malpractice, "which, in turn, depends on the resolution of (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Smith v. Botsford General Hospital*, 419 F.3d 513, 518 (6th Cir. 2005) (internal quotation marks omitted). "If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions." *Id.* (internal quotation marks omitted). Here, plaintiff's allegations meet the requirements of malpractice: both Dr. Natole and LPN Lance are medical professionals capable of committing malpractice; and the allegations sound in medical malpractice, because they pertain to actions which occurred within the course of a professional relationship and raise questions of medical judgment beyond the realm of common knowledge and experience. *Id.* Plaintiff used nearly identical allegations to support his claims of both negligence and medical malpractice. Plaintiff cannot "plead around" malpractice by alleging negligence. *See Hamer*, 2014 WL 1276563 at *10. Because plaintiff's negligence counts are actually allegations of medical malpractice, the negligence counts should be dismissed. Accordingly, defendants' motion for summary judgment should be granted as to the negligence claims alleged against Dr. Natole in Counts 7, 9, 11, 13, 15, and 17, and as to the negligence claims alleged against LPN Lance in Counts 45, 47, 49, 51, 53, 55, 57, and 59.

### B.    Medical Malpractice

Finally, the Court will address plaintiff's claims for medical malpractice against Dr. Natole and LPN Lance. "The consequence of characterizing plaintiff's claim as sounding in medical malpractice is to subject it to the prerequisites imposed by Michigan law for the bringing of a

malpractice claim, including the requirement that the complaint be accompanied by an affidavit of merit signed by a health professional, attesting to the defendants' failure to meet the standard of care. Mich. Comp. Laws § 600.2912d(1)." *Hamer*, 2014 WL 1276563 at *10.   These provisions of Michigan tort law governing malpractice cases are a matter of substantive law binding on the federal courts under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  *Id.*, citing *Jones v. Correctional Medical Services, Inc.*, 845 F.Supp.2d 824 (W.D. Mich. 2012).  If an affidavit of merit is not filed with the action, the two-year statute of limitations is not tolled when the action is filed.  *See* M.C.L. § 600.5805(6); M.C.L. § 600.2912d(1); *Young v Sellers*, 254 Mich. App. 447, 450-51; 657 N.W.2d 555 (2002).  In such cases, the failure to file an affidavit of merit at all leads to dismissal with prejudice.  *See Scarsella v Pollack*, 461 Mich. 547, 553 (2000) (when plaintiff wholly omits to file the affidavit required by M.C.L. § 600.2912d(1), "the filing of the complaint is ineffective, and does not work a tolling of the applicable period of limitation").  This is such a case.  Plaintiff's complaint was not accompanied by an affidavit of merit and the two-year statute of limitations expired more than two years ago in July 2014.   Accordingly, defendants are entitled to summary judgment on plaintiff's malpractice claims alleged against Dr. Natole in Counts 8, 10, 12, 14, 16, and 18, and against LPN Lance in Counts 46, 48, 50, 52, 54, 56, 58, and 60.

## IV.    Recommendation

For these reasons, I respectfully recommend that Dr. Natole and LPN Lance's motion for summary judgment (docket no. 199) be **GRANTED** as to plaintiff's claims of deliberate indifference alleged against Dr. Natole in Counts 1, 2, 3, 4, and 5, and against LPN Lance in Counts 37, 38, 39, 40, 41, 42 and 43, and **DENIED** as to plaintiff's claims of deliberate indifference alleged against Dr. Natole in Count 6 and against LPN Lance in Count 44.

24

I further recommend that the motion be **GRANTED** as to plaintiff's claims of negligence alleged against Dr. Natole in Counts 7, 9, 11, 13, 15 and 17, and against LPN Lance in Counts 45, 47, 49, 51, 53, 55, 57, and 59.

I further recommend that the motion be **GRANTED** as to plaintiff's claims of malpractice alleged against Dr. Natole in Counts 8, 10, 12, 14, 16 and 18, and against LPN Lance in Counts 46, 48, 50, 52, 54, 56, 58 and 60.


Dated: September 30, 2016                              /s/ Ray Kent
                                                      RAY KENT
                                                      United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).