UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN KING MEYER,

    Plaintiff,

v.

JOSEPH NATOLE, *et al.*,

    Defendants.

                                       /

Case No. 1:14-cv-536

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. *Pro se* plaintiff filed a 65-count complaint directed at six defendants. Although plaintiff filed this action while in the custody of the MDOC, his claims arise from incidents which occurred while being held in the Allegan County Jail. The record reflects that plaintiff is now on parole, having been released from prison in January 2018. *See* Changes of Address (ECF Nos. 438 and 439). This matter is now before the Court on a motion for summary judgment filed by the sole remaining defendant, Gregory Flentje, M.D. (ECF No. 387).

    **I.**    **Plaintiff's complaint**

Plaintiff's claims arise from incidents which occurred in 2012. On January 10, 2012, plaintiff was arrested and placed in the Allegan County Jail, charged with the felony of first degree criminal sexual conduct. Compl. (ECF No. 1, PageID.9); Booking Card (ECF No. 1-1, PageID.61). While being held at the jail, plaintiff suffered a cardiac arrest on July 6, 2012. Compl.

1

at PageID.15. Plaintiff's complaint alleged that six defendants violated his constitutional rights by acting with deliberate indifference to his serious medical needs: Dr. Flentje (psychiatrist); Dr. Natole (jail doctor); Social Worker Nelson; LPN Lance (jail nurse); Allegan County Jail Administrator Marcules; and Allegan County Deputy LaBrie. The Court has dismissed all defendants except for Dr. Flentje. Plaintiff's only claims remaining in this lawsuit are Counts 66, 68, 69, 71 and 72 directed against Dr. Flentje.

In Count 66, plaintiff alleged that Dr. Flentje was deliberately indifferent to his serious medical needs when the doctor prescribed Trazodone on March 23, 2012. Plaintiff alleged that Dr. Flentje "knew that Trazodone was not appropriate for Meyer because of his cardiovascular problems and family history of heart disease," that Trazodone could cause a cardiac arrest, and that despite this knowledge, Dr. Flentje prescribed Meyer Trazodone on March 23, 2012. *See* Count 66 (ECF No. 301-1, PageID.3503).

In Count 68, plaintiff alleged that Dr. Flentje was deliberately indifferent for failing to monitor plaintiff between March 23, 2012 and April 27, 2012, when plaintiff was on his original dosage of Trazodone. *See* Count 68, PageID.3505.

In Count 69, plaintiff alleged that Dr. Flentje was deliberately indifferent to his serious medical needs when the doctor "just doubled the daily dose" of Trazodone on April 2, 2012 without evaluating plaintiff. *See* Count 69, PageID.3506.

In Count 71, plaintiff alleged that Dr. Flentje was deliberately indifferent for not monitoring him between April 27, 2012 and July 6, 2012. *See* Count 71, PageID.3508.

Finally, in Count 72, plaintiff alleged that Dr. Flentje was deliberately indifferent to his serious medical needs between April 27, 2012 and July 6, 2012 because the doctor ignored plaintiff's "classic heart attack symptoms."  *See* Count 72, PageID.3509.

Defendant Dr. Flentje has filed a motion for summary judgment with respect to these Counts.  The Court has performed an extensive review of plaintiff's medical history and treatment in four previous Report and Recommendations (R&R's) (ECF Nos. 232, 237, 311, and 326).  Accordingly, the Court will limit its discussion of the record to those facts relevant to plaintiff's remaining claims against Dr. Flentje.

### II. Dr. Flentje's motion for summary judgment

#### A. Legal standard

Dr. Flentje has moved for summary judgment pursuant to Fed. R. Civ. P. 56.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

3

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the Court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Plaintiff's claims for deliberate indifference

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law."  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

During the relevant time period, plaintiff was in the custody of Allegan County as both a pre-trial detainee and a convicted felon.[1]  It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).   "Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  Thus, "[w]hether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983."  *Id.  See Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) ("[a]lthough the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well") (internal citation omitted).

A viable Eighth Amendment claim consists of an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The objective component requires the infliction of serious pain or failure to treat a serious medical condition.  *Id.* at 8-9.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

---

[1] Plaintiff alleged that he was "arrested, booked and lodged in Allegan County Jail" on January 12, 2012.  Compl. at ¶ 15, PageID.9.  He was convicted and sentenced sometime prior to September 13, 2012, the date on which plaintiff was transferred to the MDOC.  *Id.* at ¶ 192, PageID.20.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

1. **Counts 66, 68 and 69**

These three counts allege that Dr. Flentje acted with deliberate indifference when he prescribed plaintiff Trazodone on March 23, 2012 (Count 66), failed to monitor plaintiff between March 23, 2012 and April 27, 2012 (Count 68), and failed to evaluate plaintiff before increasing the dosage of Trazodone on April 27, 2012 (Count 69). The common thread in Counts 66, 68 and 69 is that Dr. Flentje prescribed plaintiff Trazodone with full knowledge that plaintiff had a pre-existing heart condition (Long QT syndrome), that Trazodone could cause plaintiff to suffer a cardiac arrest, and that plaintiff did in fact suffer a cardiac arrest. Based on this record, Dr. Flentje is entitled to summary judgment on these counts.

Dr. Flentje had two sources of information regarding plaintiff's medical history, i.e., the jail medical records and the doctor's interaction with plaintiff. With respect to the jail medical records, this Court previously determined that there was no evidence that plaintiff disclosed his heart condition to jail personnel prior to suffering his cardiac arrest. In granting Dr.

Natole's motion for summary judgment, this Court determined that "there is no evidence that plaintiff ever disclosed his cardiac issues to either Dr. Natole or a member of the jail's medical staff, and some evidence that plaintiff was not even aware of this condition until after the cardiac arrest" and that "[b]ased on this record, plaintiff has failed to demonstrate the subjective prong of his deliberate indifference claim, i.e., that prior to July 6, 2012 Dr. Natole knew of and disregarded an excessive risk to plaintiff's health due to prescribing Trazodone to a person with a diagnosis of Long QT Syndrome or allergy to SSRIs."  R&R (ECF No. 311, PageID.3557), *adopted* Order (ECF No. 349).   In support of this determination, the Court observed:

> At his deposition, plaintiff could not point to any document in which he disclosed to the jail medical staff that he suffered from cardiac problems or Long QT Syndrome.  While plaintiff admitted that his "cardiac issue" was not listed on the jail's questionnaire, plaintiff would not give a direct answer on whether he disclosed the cardiac issue to the jail's medical staff, stating only "I believe I disclosed it to somebody, and I testified that I don't remember if it was the medical or custody staff." Meyer Dep. (docket no. 200-1, PageID.2656-2657).  Plaintiff's self-serving statement is insufficient to create an issue of material fact on whether he disclosed this health problem to the jail staff.

R&R (ECF No. 311, PageID.3554-3555).

There being no record of plaintiff's diagnosis in the jail records, the issue before the Court is whether Dr. Flentje obtained knowledge of plaintiff's heart condition through his treatment of plaintiff's psychiatric problems. In his certification made pursuant to 28 U.S.C. § 1746, Dr. Flentje set forth his interactions with plaintiff:

> In his certification, Dr. Flentje stated in pertinent part:
>
> 5. From January 1, 2012 through August 31, 2012, while plaintiff was incarcerated at the Allegan County Jail, 1 provided psychiatric care and psychiatric medications to the inmates at the facility, including plaintiff: after a member of the jail medical staff identified psychiatric care was warranted.

6. The process by which inmates' psychiatric medical needs were identified was to notify the jail medical staff, verbally or in writing. Members of the jail medical staff would then evaluate inmates' charts and their complaints, and determine the most appropriate provider for responding to the inmates' medical needs. Unless I was specifically made aware by the jail medical staff that an inmate was complaining of certain psychiatric signs or symptoms, I did not treat or otherwise examine the inmates.

7. While plaintiff was at the Allegan County Jail, I treated him for anxiety and trouble sleeping.

8. I personally evaluated plaintiff on March 23, 2012, July 27, 2012 and August 31, 2012.

9. Between March 23, 2012 and August 31, 2012, each and every one of plaintiff's medical complaints were responded to appropriately.

10. The only preexisting medical conditions plaintiff ever reported to me were his history of hypertension, anxiety and seasonal allergies.

11. At no time before July 27, 2012 did plaintiff ever disclose a family cardiac history, a personal medical history of cardiac issues, or a belief that he suffered from Long QT syndrome.

12. At no time before July 27, 2012 did I ever become aware of any signs or symptoms plaintiff was exhibiting that would have led me to believe he suffered from cardiac issues and/or Long QT syndrome.

13. At no time prior to July 27, 2012 did I ever become aware plaintiff had reported he was suffering from "classic heart attack symptoms" or cardiac issues of any kind.

14. Based on my education, training, and clinical experience and judgment, I determined plaintiff should be treated with Trazodone to help him sleep better.

15. After first prescribing Trazodone to plaintiff, and up until his cardiac event on July 6, 2012, plaintiff made no complaints in writing about his Trazodone prescription, other than it was "not working" and that he would like to have his prescription increased / "pump[ed] up."

16. At no time after he first started taking Trazodone did plaintiff ever report any adverse signs or symptoms related to his Trazodone prescription.

17. At no time after I first saw plaintiff on March 23, 2012, and until after his cardiac event on July 6, 2012, was I ever made aware of any adverse signs or

>symptoms plaintiff was experiencing, whether related to the psychiatric medications I prescribed or otherwise.
>
>18. Trazodone is not contraindicated for an individual like plaintiff.
>
>19. The dose prescribed to plaintiff (50 mg. then 100 mg.) was appropriate, and a very low dose.

Flentje Certification (ECF No. 388-1, PageID.4076-4078).  The July 27, 2012 date referenced in the certification is significant, because it was Dr. Flentje's first evaluation of plaintiff after plaintiff's cardiac arrest and release from the hospital.

Dr. Flentje's statements are consistent with the medical record and establish that the doctor had limited interaction with plaintiff.  On March 15, 2012, plaintiff sent a kite requesting the medication Seraquel to treat his anxiety.  Kite (ECF No. 388-1, pageID.4068).  Former defendant Nelson responded that she would place him on a list to see the jail psychologist, who could refer plaintiff to the jail psychiatrist.  *Id*.  Dr. Flentje, the psychiatrist, examined plaintiff on March 23, 2012.  *See* Psychiatric Evaluation (ECF No. 388-1, PageID.4072-4073). There is no record that plaintiff disclosed to Dr. Flentje that he suffered from any heart problems or had a history of Long QT syndrome on that date.  *Id*.  The only medical history appearing in the record was as follows:

>MEDICAL HISTORY: Mr. Meyer has a history of hypertension for which he is treated with Clonidine and Norvasc.  He has a history of seasonal allergies, no known drug allergies, and he is status-post an ORIF on his right ankle with hardware.

*Id.* at PageID.4072.

At his deposition, plaintiff admitted that he could not recall telling Dr. Flentje that he had a history of Long QT syndrome:

>Q: Did you tell [Dr. Flentje] that you suffered from long QT syndrome?

9

      A: I can't say verbatim if I said that to him or not.

      Q: So is that a no or a yes or an I don't know?

      A: That's an I don't know.

Plaintiff's Dep. (ECF No. 388-1, PageID.4032).[2]

      Dr. Flentje diagnosed plaintiff with generalized anxiety disorder, increased plaintiff's Zoloft prescription, and prescribed 50 mg. of Trazodone daily to help plaintiff sleep. Evaluation (ECF No. 388-1, PageID.4073). Plaintiff received his first 50 mg. dose of Trazodone on March 28, 2012. Medical Adm. Rec. (ECF No. 388-1, PageID.4087). A few days later, on April 1, 2012, plaintiff requested that his Trazodone prescription be tripled stating in a kite:

> HI THERE.  CAN WE PUMP UP MY TRAZADONE FROM 50mg to 150 mg? THE NURSE SAID 50mg IS FOR SHORT SKINNY PEOPLE.  I AM 6'4" & 300 lbs.  THANKS!

Plaintiff's Kite (April 1, 2012) (ECF No. 388-1, PageID.4091). Plaintiff's request did not include any statement that he was suffering adverse effects from the Trazodone; rather, plaintiff wanted more of the drug. The next day, Ms. Nelson responded, "The Dr did not write the order for an increase. I faxed him but no response yet." Kite Response (April 2, 2012) (ECF No. 388-1, PageID.4091). Plaintiff sent another kite on April 11, 2012, asking for an update on the "TRAZADONE [sic] INCREASE & UPPING THE ZOLOFT [?]". Plaintiff's Kite (April 11, 2012) (ECF No. 388-1, PageID.4093). In her response, Ms. Nelson advised plaintiff that:

---

[2] About three months after Dr. Flentje filed his motion for summary judgment, plaintiff attempted to strike his deposition testimony. As explained in a separate order (ECF No. 434), plaintiff's claim that he was not provided with a free copy of the transcript to review was without merit. Plaintiff did not appeal that order. Plaintiff later filed an affidavit in which he: contests the Court Reporter's certification; states that his "every attempted [sic] has failed to contact the Court Report to buy a copy;" and that as of the date of the affidavit (November 14, 2017) he did not have funds to pay for a copy of the transcript. *See* Plaintiff's Affidavit (ECF No. 435). As discussed in the order (ECF No. 434) the Court relies on the Court Reporter's Certificate.

> Apparently medical never got a response. – I refaxed this AM. Don't anticipate yes or no. [H]e usually wants people on a med 4-6 weeks before making any changes. Will let you know.

Kite Response (April 12, 2012) (ECF No. 388-1, PageID.4093). On April 27, 2012, Dr. Flentje increased Meyer's Trazodone prescription, from 50 mg. to 100 mg. once daily. Psychiatrist Orders (ECF No. 388-1, PageID.4089).

At the July 27, 2012 Medication Review, Dr. Flentje diagnosed plaintiff with generalized anxiety, and plaintiff gave the subjective report "I'm glad I'm alive." The doctor's medical note for that date stated as follows:

> Mr. Meyer suffered an arrhythmia with cardiac arrest, syncope, and what the nursing staff describes as a resuscitation from death. Mr. Meyer is no longer allowed to have Trazodone due to his coronary circumstances and he requested Zoloft be discontinued after his discharge from the acute facility wherein he is treated. He now has a defibrillator. He is not being allowed to pursue cardiac rehab due to his charges. After some discussion I suggest treatment with Celexa, 20mg daily and pending his cardiologist's approval, we will use clonidine for sleep. I will follow-up with Mr. Meyer as appropriate. As I have made it clear he may have a dose increase of Celexa if that is necessary.

Medication Review (July 27, 2012) (ECF No. 388-1, PageID.4113).

Progress notes at the jail from August 22, 2012 state that testing from Dr. Relnoehl's office indicated Long QT's and stated that plaintiff was not to be on any SSRI's. Jail Progress Notes (ECF No. 388-1, PageID.4116). At a medication review on August 31, 2012, Dr. Flentje diagnosed plaintiff with "Generalized Anxiety, Prolonged QT Syndrome," noting that plaintiff gave the subjective report "Who Knew?" [sic]. Medication Review (Aug. 31, 2012) (ECF No. 388-1, PageID.4118). The doctor's medical note for that date stated:

> Mr. Meyer has recently been identified as having prolonged QT syndrome which led to his acute cardiac event of some weeks ago. He now has a defibrillator and I have an extensive list of medications to avoid including all SSRIs. Given the

11

>circumstances, I will simply put Mr. Meyer no [sic] Klonopin, 1mg daily and wish him well.

*Id*.

Based on this record, the first time that Dr. Flentje knew, or had reason to know, that plaintiff had a cardiac condition and that the Trazodone should be discontinued, was July 27, 2012, three weeks after plaintiff's cardiac arrest. Furthermore, plaintiff was not diagnosed with Long QT Syndrome until on or about August 22, 2012. Plaintiff has failed to demonstrate the subjective element of his deliberate indifference claims related to Dr. Flentje's prescription of Trazodone prior to July 6, 2012. Accordingly, Dr. Flentje is entitled to summary judgment with respect to Counts 66, 68 and 69.

### 2. Counts 71 and 72

In Count 71, plaintiff alleged that Dr. Flentje failed to monitor him between April 27, 2012 (the date the doctor increased the Trazodone prescription) and July 6, 2012 (the date plaintiff suffered the cardiac arrest). The question for the Court is whether Dr. Flentje's alleged failure to monitor plaintiff during this time period violated plaintiff's federal constitutional rights. As discussed, Dr. Flentje personally evaluated plaintiff three times at the jail: March 23, 2012; July 27, 2012; and, August 31, 2012. During the time relevant to Count 71, plaintiff made no complaints in writing about his Trazodone prescription or report any adverse signs of symptoms related to his Trazodone prescription, which Dr. Flentje's characterized as "a very low dose." On the contrary, plaintiff wanted to triple the dosage of the Trazodone. There is no evidence that Dr. Flentje knew of plaintiff's heart condition during this time (April 27, 2012 through July 6, 2012). As discussed, plaintiff was not even diagnosed with the heart condition until on or about August 22, 2012. Under these circumstances, Dr. Flentje did not act with the "obduracy and wantonness"

which characterize conduct prohibited by the Eighth Amendment. *See Whitley*, 475 U.S. at 319. Accordingly, Dr. Flentje should be granted summary judgment as to Count 71.

In Count 72, plaintiff alleged that Dr. Flentje was deliberately indifferent for ignoring his "classic heart attack symptoms" between April 27, 2012 and July 6, 2012. As an initial matter, there is no evidence that Dr. Flentje evaluated plaintiff during the time period alleged in Count 72 during which the doctor could have observed any "classic heart attack symptoms." Furthermore, in addressing a previous motion for summary judgment, the Court reviewed plaintiff's medical record at the jail and concluded that no jury could reasonably find that the jail doctor (Dr. Natole) or the jail nurse (Nurse Lance) observed or were aware that plaintiff suffered from "classic heart attack symptoms" (which plaintiff referred to as chest pains, shortness of breath, numb legs, dizziness and cold sweats) prior to the July 6, 2012 cardiac arrest. *See* R&R (ECFD No. 311, PageID.3558-3562). As discussed, *supra*, Dr. Flentje had no contact with plaintiff during the time period alleged in Count 72. Based on this record, the Court concludes that if no jury could reasonably find that the doctor and nurse who regularly treated plaintiff at the jail were aware of plaintiff's "classic heart attack symptoms" in the days and weeks before the cardiac arrest, no jury could reasonably find that a psychiatrist who had no contact with plaintiff during the relevant time period (April 27, 2012 and July 6, 2012) would be aware of plaintiff's alleged "classic heart attack symptoms." Accordingly, Dr. Flentje is entitled to summary judgment on plaintiff's Count 72.

### IV.     Recommendation

For these reasons, I respectfully recommend that Dr. Flentje's motion for summary judgment (ECF No. 387) be **GRANTED** as to plaintiff's remaining claims alleged in Counts 66, 68, 69, 71 and 72.

I further recommend that this case be **TERMINATED**.


Dated:  February 20, 2018                             /s/ Ray Kent
                                                      United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).